J-S33022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL J. TURRISI | : | |
| | : | |
| Appellant | : | No. 863 MDA 2018 |

Appeal from the Judgment of Sentence May 1, 2018
In the Court of Common Pleas of Berks County
Criminal Division at No(s):  CP-06-CR-0004575-2017

BEFORE:  LAZARUS, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                **FILED: SEPTEMBER 16, 2019**

Paul J. Turrisi appeals from the judgment of sentence imposed May 1, 2018, in the Berks County Court of Common Pleas.  The trial court sentenced Turrisi to nine months' probation after he was convicted by a jury of one count of harassment.  *See* 18 Pa.C.S. § 2709(a)(4).  On appeal, Turrisi argues the evidence was insufficient to sustain his conviction.  For the reasons below, we affirm.

The trial court summarized the testimony presented at Turrisi's jury trial as follows:

> At trial, the Commonwealth presented testimony from four victims/eyewitnesses to the harassment - three members of the tree-trimming crew (Maria Osto[r]ga, Jose Oscar Orellana, and Daniel Francisco Hernandez) and [Turrisi's] neighbor (Mr. Bullard).  The testimony essentially established that the tree-trimming crew had just begun work on September 9, 2017, when [Turrisi] (an adjoining landowner) approached the crew and told them to stop working because, in [Turrisi's] mind, the crew was

illegally trimming holly trees located on or near the border of the two properties. [Turrisi] threat[en]ed to shoot the work crew and/or Mr. Bullard if the crew trimmed the holly trees and/or another bush located next to the holly trees (the "burning bush").

There were three holly trees at issue. It was established that the trunks of the trees were located on Mr. Bullard's property, approximately five or six feet from the boundary with [Turrisi's] property, but that several branches on each tree extended over the boundary line. The holly trees had been trimmed by the same work crew approximately one week prior to the date/conduct at issue. Concerning the northernmost tree ["Tree No. 1"] two of the branches that extended over the property line on to [Turrisi's] property were cut at a spot six (6) inches over the property line, *i.e.* the cut was made at a spot hanging over [Turrisi's] property, six inches from the boundary. Of all the branches on the center tree ["Tree No. 2"], one that extended over onto [Turrisi's] property was cut one (1) foot from the property line. Finally, three branches from the southernmost tree ["Tree No. 3"] were cut at seven (7) inches from the line/over [Turrisi's] property. In all, six branches were cut that extended over the boundary line.

Maria Ostorga, the head of the tree-trimming crew, testified first for the Commonwealth. She was the only member of the crew who spoke and understood English. The crew had not yet started to work on September 9, 2017, when [Turrisi] approached. Ms. Ostorga stated that [Turrisi] "was real upset" by "[t]he way he was screaming at me." [Turrisi] "was saying, 'I want to see your papers, I want to see your documents, I want to see this, I want to see your permit'... And he said 'you better stop cutting my trees or I am going to bring my shotgun.'"

Ms. Ostorga called Mr. Bullard, the property owner who had hired the tree-trimming crew, and asked him to return to his property. Mr. Bullard arrived and began speaking with [Turrisi]. [Turrisi's] mood got worse once Bullard arrived. While speaking to Mr. Bullard, [Turrisi] "was screaming" and "was real upset." "[Turrisi] was saying fuck you, shut up, what are you cutting my trees for. And Mr. Dave said 'hold on, we are not cutting your trees down, I am just trimming this side.' But [Turrisi] kept on going screaming." "Then [Turrisi] got his phone out and he said he was going to call the police... And then he said, he told the police, "'if you don't get here, I am going to take care of them right now' or 'I am going to take care of this myself.'" Ms. Ostorga heard [Turrisi] tell the 911 operator, "'if you don't come right

away, I am going to take care of this myself.'" [Turrisi's] conduct and language made Ms. Ostorga nervous and scared. Prior to the arrival of the police, [Turrisi] referenced a light pole located nearby and said, "'if you go past the light pole, I'm going to shoot you.'" [Turrisi] stated that he would get a shotgun if any person from the tree-trimming crew went on his property. The police arrived approximately five minutes after [Turrisi] called 911

Jose Oscar Orellana was a member of the work crew and testified at trial. He was one of the two crew members that [Turrisi] initially approached. Mr. Orellana does not speak English. Nevertheless, Mr. Orellana could tell based on [Turrisi's] tone that he was "interrogating [Ms. Ostorga], like humbling her." [Turrisi] told Ms. Ostorga that the tree-trimming crew was committing a crime. Mr. Orellana stated that he felt "nervous" and "bad" because – as translated to Mr. Orellana by Ms. Ostorga at the time of the encounter – [Turrisi] stated that he was going to get a rifle and "eliminate" him if he crossed a property boundary. Mr. Orellana testified that he had never crossed the purported boundary identified by [Turrisi]. Mr. Orellana testified that he felt "desperate" and "had never felt like that before, like I felt that day." Mr. Orellana did not understand [Turrisi's] words, but could tell that [Turrisi] was speaking very loudly and "very badly" to Mr. Bullard.

Mr. Bullard testified that, upon arriving at the location of the encounter in his back yard, he engaged [Turrisi] directly. During this interaction, [Turrisi] told Mr. Bullard that he, "was in big trouble and that what was a civil matter had now become a criminal matter and that [Mr. Bullard] better be prepared to face the consequences." [Turrisi] asked Mr. Bullard if the crew would be doing any additional trimming, and Mr. Bullard replied that the crew would be working all day around the property. "And that's when [Turrisi] said 'maybe I should get my shotgun.'" Ms. Ostorga was present when [Turrisi] made this threat. [Turrisi] asked if the crew would be trimming the "burning bush", which is located at the end of the row of holly trees near a light utility pole. Mr. Bullard indicated that the burning bush was on the list, and [Turrisi] warned: "If anyone goes near that utility pole, I will blow your heads off." At that point Mr. Bullard told Maria to take the work crew to the other side of the house and demanded that [Turrisi] get off his property immediately. [Turrisi] did not leave Mr. Bullard's property.

Eventually, [Turrisi] called 911 to request that police respond. Upon arrival, [Turrisi] told Reading Police Officer Vincent Leazier that, "... the neighbors, the landscapers were cutting down his trees. They were destroying his trees, and he demanded that they be arrested." Officer Leazier responded that this was a civil dispute and, as he explained to [Turrisi] his professional opinion of how to handle the situation, "[Turrisi] interrupted me and told me that if I did not get them off his property, he was going to get his shotgun and shoot them." Officer Leazier advised [Turrisi] not to use force, which "seemed to anger [Turrisi] more and he began slapping the trees." [Turrisi] declared: "'These are my trees. They are destroying my trees.' And... he said, 'I'm sorry, if [Officer Leazier] [doesn't] do something, [I am] going to take the law into [my] own hands.'"

Trial Court Opinion, 2/28/2019, at 4-7.

Turrisi was subsequently arrested and charged with one count each of terroristic threats, 18 Pa.C.S. § 2706(a)(1), and harassment (course of conduct), 18 Pa.C.S. § 2709(a)(3). The charge of harassment under Subsection 2709(a)(3) was dismissed at the preliminary hearing. Therefore, the information filed on October 10, 2017, listed only one charge of terroristic threats.

Prior to trial, the court granted the Commonwealth's motion in *limine* to amend the information to include a charge of harassment under Subsection 2709(a)(4).[1] On March 27, 2018, the jury returned a verdict of guilty on the charge of harassment and not guilty on the charge of terroristic threats.

_____

[1] The trial court denied Turrisi's pretrial motion for writ of *habeas corpus*, and a supplemental motion in *limine* filed by the Commonwealth seeking to preclude Turrisi from presenting a castle doctrine (defense of property) defense.

Turrisi was sentenced on May 1, 2018, to a term of nine months' probation. This timely appeal followed.[2]

Turrisi's sole issue on appeal is a challenge to the sufficiency of the evidence supporting his conviction of harassment.

> "In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense." When performing this review, "we may not reweigh the evidence or substitute our own judgment for that of the fact finder."

*Commonwealth v. Cox*, 72 A.3d 719, 721 (Pa. Super. 2013) (internal citations omitted). Moreover, we note "the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019) (quotation omitted).

---

[2] On May 30, 2018, the trial court ordered Turrisi to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). When Turrisi failed to do so by August 16, 2018, the court filed an opinion concluding all of Turrisi's issues were waived on appeal. On September 12, 2018, Turrisi's counsel filed an application for remand in this Court, seeking permission to file a concise statement *nunc pro tunc*. This Court granted the application on September 17, 2018, and remanded the case with directions (1) to counsel to file a concise statement within 21 days, and (2) to the trial court to file a supplemental opinion 30 days thereafter. Although counsel filed a timely concise statement on October 5, 2018, the trial court neglected to file a supplemental opinion. Thereafter, this Court issued three follow-up orders, each directing the trial court to file its opinion. The trial court finally complied on February 28, 2019.

Turrisi first argues the evidence failed to establish he made a threat to the non-English speaking complainants because "any alleged threat was conveyed to them by [Ms. Ostorga]," not by Turrisi himself. Turrisi's Brief at 8. Furthermore, he asserts that "[i]n the context of the statute it would appear that the threat must be one to do something illegal," and his threat that he would take care of the situation himself "is ambiguous and not illegal." *Id.* at 9. We find Turrisi's claim is belied by the evidence.

Pursuant to Section 2709(a)(4) of the Crimes Code, a defendant may be convicted of harassment if the Commonwealth proves the defendant, "with intent to harass, annoy or alarm another … communicate[d] to or about [the complainant] any lewd, lascivious, threatening or obscene words, language, drawings or caricatures[.]" 18 Pa.C.S. § 2709(a)(4).

Here, the evidence clearly established Turrisi communicated threatening words **both to** Maria Ostorga directly **and about** her work crew.[3] Ostorga testified that when Turrisi began screaming at her and the crew, he stated, "you better stop cutting my trees or I am going to bring my shotgun." N.T., 3/26-27/2018, at 32. Therefore, when considered in context, Turrisi's statement to the 911 operator, "if you don't come right away, I am going to

_____

[3] To the extent Turrisi asserts the evidence did not establish he used obscene language, we find no such requirement under the statute. **See** Turrisi's Brief at 10-11. Indeed, Subsection (a)(4) requires proof that the defendant communicated "lewd, lascivious, threatening **or** obscene words, language, drawings or caricatures[.]" 18 Pa.C.S. § 2709(a)(4)(emphasis supplied). As will be discussed *infra*, we find the evidence demonstrated Turrisi used "threatening" words and language.

take care of this myself[,]" constituted threatening language. *Id.* at 36-37. Furthermore, Ostorga also testified Turrisi referenced his property line, and said to her, "if you go past the light poles, I'm going to shoot you." *Id.* at 37. Jose Oscar Orellana, Ostorga's nephew and part of the work crew, testified that Turrisi began screaming at him and another co-worker in English, which neither of them understood. *See id.* at 46. However, Orellana testified Ostorga explained to them Turrisi "wanted to cause us harm" and if they "pass[ed]" into a certain area, "he was going to take out a rifle." *Id.* at 47, 49. Another man on the work crew, Daniel Francisco Hernandez, corroborated Orellana's testimony. *See id.* at 63. Ostorga called the owner of the property, David Bullard, who returned home to speak to Turrisi. Moreover, Bullard testified that when he explained to Turrisi that the workers would be trimming trees at the property all day, "that's when [Turrisi] said maybe I should get my shotgun." *Id.* at 75. Bullard claimed Turrisi also said that if anyone went near a utility pole on his property, he would "blow [their] heads off." *Id.* at 76.

Although Turrisi, himself, testified he did not swear or raise his voice when he confronted the work crew, and never threatened to get his gun,[4] the jury found his testimony not credible, as was its prerogative. *See Smith*, *supra*. Therefore, the fact that some of the complainants did not speak English is irrelevant. Turrisi asserts his actions were justified because he was

_____

[4] *See* N.T., 3/26-27/2018, at 138, 152.

defending his property, *see* 18 Pa.C.S. § 507 ("Use of force for the protection of property"); however, Turrisi presented this defense to the jury, who, based upon their verdict, rejected it. We note Section 507 permits the use of deadly force only if "there has been an entry into the [defendant's] dwelling[.]" 18 Pa.C.S. § 507(c)(4)(i)(A). Here, there is no testimony that any of the work crew entered Turrisi's home or attached porch[5] as would justify the use of deadly force. Accordingly, we find the evidence presented at trial was sufficient to support the jury's verdict.

Turrisi also contends the evidence did not establish he engaged in a course of conduct to harass the complainants. *See* Turrisi's Brief at 9-10. However, this argument is misplaced. Proof of a course of conduct of harassing behavior is required for a conviction of Section 2709(a)(3). *See* 18 Pa.C.S. § 2709(a)(3) ("A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person … engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose"). Although Turrisi was originally charged with that offense, the charge was dismissed at the preliminary hearing. Subsequently, the trial court permitted the Commonwealth to amend the information to include a charge of

---

[5] A "dwelling" is defined in the Crimes Code as "[a]ny building or structure, including any attached porch, deck or patio, though movable or temporary, or a portion thereof, which is for the time being the home or place of lodging of the actor." 18 Pa.C.S. § 501.

harassment under Subsection 2709(a)(4). As noted above, Subsection 2709(a)(4) does not require proof of a course of conduct.

Accordingly, we conclude Turrisi's challenge to the sufficiency of the evidence is meritless, and affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/16/2019